The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this honorable court may give their attendance and they shall be heard. God save the United States of America and this honorable court, court is in session. Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is United States v. Rosnell Ortiz, appeal number 20-1083. Attorney Wood, please introduce yourself for the record and proceed with your argument. May it please the court. My name is Chauncey Wood and I represent the appellant, Rosnell Ortiz. I would like to request one minute of rebuttal. You may have it. Thank you. The district court's conspiracy instruction created reversible error. Specifically, his 11th hour instruction that the jury could convict Ortiz if they found that he conspired with Black alone but not his co-defendant, Pena, to redistribute illegal drugs was unsupported by the evidence. There was no evidence that Black shared any intent to redistribute drugs he may have supplied. Therefore, it was improper to instruct the jury that they could convict either Pena or Ortiz of conspiring with Black to redistribute drugs. Defense counsel clearly lodged a timely objection to this error. Because the government explicitly argued in closing that the jury should convict Ortiz because he, quote, agreed with Black to distribute drugs, close quote, and the judge instructed the jury that they could convict on such a theory, the error was not harmless beyond a reasonable doubt and reversal is required. This instruction also created plain error because the judge did not make clear that the jury had defined that Black shared an intent to redistribute any drugs he may have supplied, the so-called buyer-seller instruction explained in US v. Biondi, and also the judge failed to include a cautionary multiple conspiracy instruction to ensure that any conviction was based on a charged conspiracy. These were both necessary in light of the judge's decision at the last minute to expand the conspiracy instruction. The second issue I would like to discuss is the confidential informant's claim that he was buying 62 grams and he delivered to his handlers 50 grams, so that actually undermined the idea that there was some agreement for that. In any event, the crucial element I think you're getting at, I mean I understand your supports an inference, a reasonable inference I guess you're claiming, that the wholesaler shared an intent to redistribute, but I think the crucial point here is the wholesaler doesn't care. There's no evidence here is the most important point that this wholesaler, if he existed, shared any intent about what the middleman here did with whatever was sold by the wholesaler.  of the Goldstein on Gelt radio show. Suppose the sale was for 5,000 grams. Wouldn't we readily infer that the seller certainly anticipated that the buyer was going to not just use it all him or herself? I think that's the crucial problem here. It's fine to anticipate what will happen. We can all guess what will happen, but most respectfully, the requirement here I think is clear that he has to share the intent that it be redistributed. If for whatever reason he sold it, he's lost his proprietary interest in this substance and I think anybody in that commercial transaction, legal or illegal, recognizes I've lost my interest in what I've sold as a wholesaler and I have no interest in what the middleman, my buyer, does with this. That is the crucial point. I'm sorry, but I don't think that follows. Wholesalers routinely charge a little less when they know that their product is going to be distributed because the retailer also has to make a profit. Your assumption that the wholesaler cannot be inferred to care in the least whether it's a retail sale or for further distribution I think just doesn't logically follow, but I'm sorry to have taken your time. Reach your other argument, please. Thank you, Your Honor. Very briefly on the second issue that I think is worthy of mentioning here, the district court erroneously limited Ortiz's cross-examination of RE's government handler, preventing him from establishing that RE had falsely accused Ortiz of a different drug sale roughly two weeks after the alleged drug sale here and had the ability to hide drugs in his vehicle. This left the jury with an unfairly slanted view of RE's credibility, the central issue in the case. The defense clearly objected to this ruling. Because the judge's restriction of Ortiz's constitutional right to cross-examination on a central issue was not harmless beyond a reasonable doubt, reversal is required. I think it is absolutely central here that this, and this case, Johnson v. Brewer, I think is directly on point here. I think this is not merely a restriction on cross-examination, but in fact rises to the accuser here falsely accused my client of the exact same thing two weeks later, and his lawyer, it's clear that my client didn't do that, and he was prevented from bringing that out. I think that is quite simply reversible error. Mr. Wood, could you pause a bit and expand on why the CI's testimony was, the credibility of it was essential, given the videos that we have here and recordings? Yes, Your Honor. So it's crucial to understand, I would zero in on the second recording on January 6, the exchange between Pena and RE in the bathroom with the water running and the door closed. The government's own witnesses, and I cite this in my brief, concede that you can't tell what they are exchanging there. To the extent you can tell, it looks like, and everybody agrees with this, a white card, probably a hotel, it looks, I guess, like a hotel card, but not two bags of crack cocaine. So that's crucial. And so I think that the credibility of RE is absolutely essential. The government makes a very technical argument that if you look at the words he spoke, none of those words are crucial to the government's case. But that, I submit, is missing the forest for the trees in the extreme. It is clear that after that transaction, whatever it is, he drives to his handler. He hands his handler two bags of crack cocaine, and the handler assumes that, or I think they explicitly discuss, that he received these from Pena, and the handler believes this was what he got from Pena. That is the crux of this. I got from these guys these two bags. That's the crucial thing. And so respectfully, I simply submit that the government is missing the forest for the trees here. It is the CI's, RE's credibility is central to the government's case. Even if he didn't explicitly say, on tape, I received crack cocaine from Pena. I'm not sure where I am on time, but I reserved one minute. I don't know if I have more time. I'll give you one minute to finish your answer, and then you have your reserved time. Thank you very much, Your Honor. I think it is one last point I would make, is that the buyer-seller instruction, that instruction we submit, the lack of a buyer-seller instruction as required by US v. Biondi, in this context, created plain error. I recognize that as a high standard to meet, but I submit that the Seventh Circuit, in a factually analogous situation, US v. Gee, as I said in my brief at pages 28 and 29, held that the lack of a buyer-seller instruction in similar circumstances did indeed establish plain error. So I submit, on the basis of US v. Gee, that the lack of a buyer-seller instruction here did create plain error. And again, this problem was created at the 11th hour by the court and the government after the government had rested. The time has expired. Thank you very much. Thank you, Mr. Wood. Please mute your audio and video at this time. Mr. Lockhart, please introduce yourself on the record. Mr. Wood, please mute your video. Good morning. Donald Lockhart for the government, and may it please the court. I'll address first the jury instruction claim, and in particular, Mr. Ortiz's assertion that there was no evidence that the defendant's supplier here, Mr. Black, shared their intent that the drugs would be distributed after he supplied them to the defendants. Now, the record contradicts that point in a major way, because Mr. Black, as quoted by Mr. Pena himself during the parking lot conversation, said, yo, try to see if he, meaning the customer that they were dealing to, the CI, yo, try to see if he even wants that seven grams. In other words, see if he'll just accept the lower amount that Black was able to muster, the seven grams. And Pena fires back at Black. He says, why would the customer want a seven when he's buying 62 grams? So right in that little back and forth between Black and Pena, we see that Black clearly knows that these two guys are selling the crack to an end user. Here, it's the CI. And we know, moreover, that Black is very anxious to see that deal go through, even if it's just for the seven grams that he was able to come up with that day. And to Judge Lynch's point earlier, wholesalers like Black very clearly have an interest in the success of the retailers. And so Black clearly wanted this sale to go through, in part, so that the defendants would come back in later transactions and get more supply from Black. So the notion that there was no evidence that Black shared their intent to redistribute simply isn't the case. I think one of Mr. Wood's points, if I understood it, was that 50 grams, as best we can tell from this record, how do we say it's more like 5,000 than it's like 0.5? In other words, how do we infer that it's not for personal use? Right. The surrounding evidence here, Judge Kayada, shows that there is just no indication whatsoever that either defendant is getting these drugs for personal use. So that's the strongest sort of rebuttal of sort of any sort of argument about the significance of weight. Well, it would be the CI who would, in other words, is the relevant issue on Black's intent. Actually, I think that the CI here is seemingly the end user of the drugs. The two defendants are seemingly the middle people between him and Black. So the point is that even if we posit that the CI is the end user and not another sort of middleman who's working toward a retail sale that's further down the line, the fact is that neither defendant presents in the conversation in the parking lot as a user. They're all talking about this deal in terms of, you know, this is our regular supplier, Black, and we are going to take the drugs that Black is giving us and then sell them to the CI. So that's the way the whole deal is structured here. So intrinsic in that is clearly, very clearly the notion that these defendants are not accepting the drugs for their own personal use. The defense never made any claim in the trial court and never introduced any evidence either suggesting that they were mere end users. So I think the issue about weight is potentially not so significant here. But there was another claim concerning the jury instructions, and that one was not preserved in the district court. The claim there was that the judge's instruction didn't adequately convey the idea that Black had to share the intent of these two defendants that the drugs would be redistributed. And as we say in the brief, actually, there is a passage that the district court from the jury instructions where the district court says, quote, there had to be proof that there was an actual agreement between Black and Ortiz to supply the drugs which were going to be distributed. Now, in that very sentence, you see that the word supply comes before the phrase going to be distributed. So what the judge is saying in this sentence is Black has to be aware and want these drugs to be distributed after he supplies them. And at the very least on plain error review, it's certainly not plainly or obviously the case that the judge failed to make that point. And the defendants, as we say in the brief, also fail the third and fourth prongs of the plain error test. Relatedly, just at the end of the defense argument, there was a brief mention of the buyer-seller instruction. And here, the point is twofold. Number one, this is another claim that wasn't raised below and that's reviewed for plain error. And number two, the very sentence that I just quoted before adequately captures the idea that it's insufficient that Black merely sell drugs to these two defendants. He has to share their intent that they're going to be redistributed. Buyer-seller instruction would merely underscore that basic point. And since none was requested, it's certainly not plain error that the judge failed to give it sua sponte. If the court has no questions about the jury instruction issues, I'll proceed briefly to the claim about the judge precluding the defense, Mr. Ortiz anyway, from introducing the CI's statements concerning some collateral matters. And here, the key point is that if you look carefully at the January 5th parking lot transaction, the conversation there, and you look at the hotel room conversation, what you see is that the CI is essentially just showing up in each case. He's making almost no statements of any significance whatsoever. In the parking lot conversation, the CI says basically two points. One, I'd like the amount of drugs that I was told I would receive. And number two, on the logistical front, I can meet later tonight or tomorrow when Black comes through with the drugs. Actually, the CI himself never refers to Black. He never points the finger at the defendants in any way. He never makes any substantive remarks to the effect that they're drug dealers. He simply says, yes, let's go through with the deal, and it can be done later tonight or tomorrow. So the question arises, what in these later events for the CI makes hearsay statements? How could that have meaningfully counteracted anything that the CI said on those two dates? And the answer is, from our perspective, there's really nothing there. It would have been almost meaningless. Mr. Lockhart, as I understood Mr. Wood's argument, he was saying that in the video, you cannot tell that the object that was taken into the bathroom was baggy with however much of drugs in it, that it could simply have been a card from the hotel. And that is the issue on which the credibility was important. Could you address that, please? Yes, of course. So a couple points. First of all, remember also that in this same bathroom, it can be seen clearly that Mr. So that certainly makes it a little bit more difficult to claim that there was something innocent going on in the bathroom. But more than that, the evidence is that this CI was followed by the agents to the hotel. He was wearing a video in his hat. The transaction is essentially seamless, following him into the hotel. And then after the hotel episode, back to the awaiting agents. And there's just no real room in that scenario for any planting or framing to be done. Notice also that the defense theory of framing depends on the assumption that the CI was somehow able to acquire roughly $4,000 worth of crack cocaine. Independently from some other source and secrete that into on his person or into the SUV he was driving and then use that to frame the defendants. The whole time has expired. Fence theory, if I may just finish my point was so just so ludicrous on its face. And the CI statements from the January 23rd Revere deal and the other statements that they wanted in really would have done almost nothing to advance that incredibly anemic defense. The court has no questions. We'll rest on our brief. Thank you. Thank you, Mr. Lockhart. You may mute your audio and video at this time, Mr. Wood. Please go ahead and introduce yourself for the record. You have one minute. Chauncey Wood for the appellant. Very briefly, the government focuses on this supposed statement from Black. Yo, try to see if you even want that seven grams. I addressed this in my reply brief at pages four to five. In fact, a close reading demonstrates that Pena claimed he was in telephonic contact with the Black both to get the drugs in the first place and at some point vaguely afterwards. And if you think about it for just two seconds, the government's argument crumbles because in a nutshell, as I explained at four to five in my reply brief, that means that Pena could have corrected any problem in delivery. I wanted 62, not seven. And so it begs the question, why didn't he fix that problem in the first place? In other words, he's making Black up. And he also, I think if you look at it closely, it is an inference from the government that it's not Black. He doesn't say Black says yo. He says, see if he wants that. We don't know who he is. So it's speculation. The second point I would make, the government actually conceded here at Oral Argument, weight is not so important. So whether this is 50 grams or not, I think is actually not particularly important. What about the hotel room mirror reflecting that cash has been handed over, obviously not for a hotel room card? The reality is that I agree that it appears that cash is handed over, cash is counted. It's actually supposed to be $3,800 and the factual record is very clear that there's no way he was counting $3,800. But sure, cash was exchanged for a white key card. That's the best we can tell. They have to prove that there was a conspiracy to exchange money for drugs specifically. And the video does not... All right, you're saying the evidence is insufficient. Thank you, Mr. Wood. Thank you very much. Thank you. That concludes argument in this case. Attorney Wood, you may remain in the meeting. Attorney Lockhart, you should remain in the meeting.